IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 13-37200 |
| | § | |
| GOLDKING HOLDINGS, LLC, *et al.*,[1] | § | |
| | § | |
| | § | Chapter 11 |
| Debtors, | § | (Jointly Administered) |
| | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| GOLDKING HOLDINGS, LLC; GOLDKING | § | |
| ONSHORE OPERATING, LLC; and | § | |
| GOLDKING RESOURCES, LLC, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Adv. Proc. No. 14-_____ |
| v. | § | |
| | § | |
| LEONARD C. TALLERINE, JR., | § | |
| GOLDKING ENERGY CORPORATION, | § | |
| PAUL V. CULOTTA, and WHITNEY L. | § | |
| BELANGER a/k/a LOUIS BELANGER, JR. | § | |
| | § | |
| Defendants. | § | |
| | § | |

**OBJECTION TO PROOFS OF CLAIM BY (i) LEONARD C. TALLERINE, JR., (ii)
GOLDKING ENERGY CORPORATION, (iii) PAUL V. CULOTTA,
AND (iv) WHITNEY LOUIS BELANGER, JR., WITH COUNTERCLAIM FOR
AFFIRMATIVE AND DECLARATORY RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE DAVID R. JONES:

Goldking Holdings, LLC ("Holdings"), Goldking Onshore Operating, LLC ("GOO"),

and Goldking Resources, LLC ("Resources") (each, a "Debtor," and collectively, the "Debtors")

file this Objection to Proof of Claim by (i) Leonard C. Tallerine, Jr., (ii) Goldking Energy

---

[1]     The Debtors, together with the last four digits of each Debtor's federal tax identification number, are:
Goldking Holdings, LLC (2614); Goldking Onshore Operating, LLC (2653); and Goldking Resources, LLC (2682).
The mailing address for the Debtors is 777 Walker Street, Suite 2500, Houston, TX 77002.

Corporation, (iii) Paul V. Culotta, and (iv) Whitney Louis Belanger, Jr., with Counterclaim for Affirmative and Declaratory Relief.  In support of this Objection and Counterclaim, the Debtors respectfully state as follows:

## SUMMARY STATEMENT OF RELIEF

1.        Proofs of claim have been filed by (i) Leonard C. Tallerine, Jr. ("LT") (claim #131) against Holdings, (ii) Goldking Energy Corporation ("GEC") (claim #24) against GOO, (iii) Paul V. Culotta ("Culotta") (claim #19) against GOO, and (iv) Whitney L. Belanger a/k/a Louis Belanger, Jr. ("Belanger") (claim #1), also against GOO, with each claimant (collectively the "Claimants") seeking recovery from the Debtors' estates.  Debtors object to, and seek affirmative recovery from, or subordination of, these Claimants on the grounds that (i) the amounts claimed are excessive, in violation of operative agreements and without basis; (ii) the claims are subject to offset, recoupment, or disallowance by virtue of violation of the automatic stay, on account of affirmative claims made by the Debtors against each relating to the conversion and expropriation of monies or property of the Debtors; (iii) each of the Claimants has claims against them rendering the claims disallowed by operation of section 502; and (iv) each of the claims are subject to equitable subordination.

## JURISDICTION AND VENUE

2.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the Southern District of Texas, dated as of February 29, 2012 (the "Amended Standing Order").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.       On October 30, 2013 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"). The Debtors have continued in possession of their properties and have continued to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in these bankruptcy cases (the "Chapter 11 Cases").

4.       The Debtors operate an oil and gas exploration and production company. Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the Declaration of Edward Hebert in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 2] (the "First Day Declaration"), which is incorporated herein by reference.

5.       On November 20, 2013, the United States Bankruptcy Court for the District of Delaware entered an order [Docket No. 88] transferring venue of the Chapter 11 Cases to this Court.

### The Role and Relationships Between the Claimants and the Debtors

6.       LT served as the President and CEO of Debtors, and was one of three managers of Holdings, from the Debtors' inception in 2010 until he was terminated in December of 2013. LT was also on the Board of Managers, and originally owned approximately 6% of the Company through a company that he wholly owned named Goldking LT Capital Corp. ("GK-LT"). His ownership was subsequently reduced upon his refusal to provide capital contributions.

7.       In Fall 2012, it was reported to the other two Holdings' managers and then the 94% owner Wayzata Opportunities Fund II, LP ("Wayzata") that LT and others having longstanding close business and personal relationships with him were regularly using the

3

Debtors' accounts and resources to fund and subsidize LT's lavish lifestyle and his other unaffiliated personal interests and business activities. An investigation ensued, confirming the initial reports.

8.      When presented with details of his wrongdoing, LT lacked any plausible explanation. As a result, LT was terminated as CEO for cause on December 17, 2012. Others implicated in these transfers were similarly terminated, once their involvement was confirmed.

9.      GEC is one of LT's unaffiliated companies that he solely owns and operates. GEC is understood to own and operate a "Hawker" jet aircraft that LT uses for his own separate business and personal needs, unrelated to the Debtors.

10.      Culotta was the former Senior Vice President Corporate Planning, Budget and Analysis of GOO. Culotta was terminated from his position with Debtors in late 2011, but continued to serve as a consultant to the Debtors while it still operated under the direction and supervision of LT in 2012. After the date of his separation, Culotta assisted LT and others in concealing the improper transfers made from Debtors' funds to or for the benefit of LT and his unrelated interests from the Debtors' auditors, Wayzata, and Holdings' other board members.

11.      Belanger was a Senior Vice President-Reservoir Engineer[2] of GOO who was terminated in May 2013 in connection with Debtors' downsizing efforts. Belanger has refused Debtors' previous demands to return certain property belonging to the Debtors that should have been returned upon his termination, and which he continues to withhold in violation of the automatic stay.

---

[2]      As self-described in Belanger's affidavit attached to the proof of claim.

**The Debtors Capital and Debt Structure**

12.     Debtors were formed in August, 2010.  At the time of formation, Holdings was owned 93.75% by Wayzata, and 6.25% by GK-LT, an entity wholly-owned by LT.[3]

13.     Soon after its formation the Debtors closed on the purchase of oil and gas properties from White Oak Energy, LLC ("WOE"), paying about $41 million (the "White Oak Transaction").  Most of the capital needed came from Wayzata.

14.     As part of its operations and to facilitate the development of oil and gas properties to be acquired, the Debtors arranged initial financing through capital contributions (sourced mostly from Wayzata), and the implementation of bank financing by and through Bank of America, N.A. ("BOA").  Prior to the commencement of the Chapter 11 Cases, the Debtors entered into that certain Credit Agreement, dated November 5, 2010, by and among the Debtors, the financial institutions named therein, as banks, BOA, as administrative agent and issuing bank, and Banc of America Securities LLC, as lead arranger and book manager (as the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, (the "Existing Credit Agreement"), a copy of which is filed with the Court).[4]

15.     Prior to the Petition Date, BOA made loans, advances and provided other financial accommodations to Borrower pursuant to the terms and conditions set forth in (1) the Existing Credit Agreement, and (2) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of BOA (and, by virtue of the Assignment, Wayzata),

---

[3]     Since formation of the Debtors and as a result of capital calls whereby Wayzata provided additional capital while GK-LT did not, the ownership has shifted to approximately 95% for Wayzata and approximately 5% for GK-LT.

[4]     Capitalized terms used but not otherwise defined in this pleading shall have the respective meanings ascribed thereto in the (i) Motion for post-petition financing, the Existing Credit Agreement, the Ratification Agreement, and the Credit Agreement (as defined therein), at Docket #11 and (ii) the Permanent Financing Order found respectively at docket number 198, and which comprise binding adjudicated facts and law of the case applicable herein, issued on notice to the claimants herein.

including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto, as assigned by BOA to Wayzata pursuant to the Assignment (all of the foregoing, together with the Existing Credit Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Existing Credit Documents").

16.     Pursuant to the Assignment and Acceptance (the "Assignment and Acceptance"), the Resignation, Assignment and Release Agreement (the "Resignation"), and the Release Agreement (the "Release," and together with the Assignment and Acceptance and the Resignation, each as amended, modified or supplemented from time to time, collectively the "Assignment"), each dated as of January 24, 2013, by and among the Debtors, BOA, and Agent (referred to hereinafter as the "Lender"), BOA assigned, sold and delegated all of its rights and obligations under the Existing Credit Agreement to Wayzata following a declared default that occurred.  The Assignment was a valid, binding and enforceable assignment of the Existing Credit Agreement's rights and obligations from BOA to Wayzata.

17.     As of the Petition Date, the aggregate judicially determined amount of all obligations owing by the Debtors  to Wayzata under and in connection with the Existing Credit Documents was not less than $11,582,729.51, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, and as such term is more fully defined in the Ratification Agreement, the "Pre-Petition Obligations").

18. The Pre-Petition Obligations, which have previously been found and determined to be fully secured and perfected by enforceable liens and security interests, constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtors. By prior Court order, they shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess and shall not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

19. Also, by prior order of the Court, the Debtors have also been authorized and empowered to borrow, obtain and incur post-petition indebtedness and obligations from Wayzata pursuant to the terms and conditions of the Permanent Financing Order, the Existing Credit Agreement (as such term is more fully defined in the Ratification Agreement), as ratified and amended by the Ratification Agreement (the "Credit Agreement,"), and the other Existing Credit Documents (as such term is more fully defined in the Ratification Agreement), as ratified and amended by the Ratification Agreement (the "Credit Documents,"), in such amounts as may be made available to Borrower by Lender in accordance with the Budget. Subject to the terms and conditions contained in this Permanent Financing Order and the Credit Documents, including Section 5.2 of the Ratification Agreement, Debtors use the proceeds of the Loans and any other credit accommodations provided to or for the benefit of Debtors pursuant to this Permanent Financing Order, the Credit Agreement or the other Credit Documents for, inter alia, the payment of employee salaries, payroll, taxes, and all other expenses specified in the Budget for other operating and working capital purposes, including, without limitation, the Hedging Obligations (including any amounts for the Hedging Obligations related to the period prior to the

Petition Date), in the ordinary course of Debtors' business in accordance with the Credit Documents, including the fees of the U.S. Trustee, the Clerk of this Court and, subject to Section 2.3 of this Permanent Financing Order, Allowed Professional Fees (as defined in the Permanent Financing Order). At this time, these include aggregate advances total over $13 million, inclusive of the Pre-Petition Obligations.

20.     The Debtors also have obligations associated with its operation of the oil and gas properties and as a result of litigation efforts commenced pre-bankruptcy to address the issues caused by LT and others' activities. These other obligations include claims by ad valorem taxing and other governmental entities, and to unsecured creditors providing goods and services to the Debtors. There are approximately $2 million in other claims, though disputed claims above this amount have been filed in the bankruptcy case.

21.     The Debtors also have obligations associated with the investigation, prosecution and administration of the litigation issues arising from the disputes with LT as well as the issues in the Chapter 11 Cases. This also includes indemnity claims. There are also allowed priority claims relating to employees under retention programs.

### The Claim Filed By LT

22.     LT's claim includes amounts alleged to be due as follows: (i) $555,070.41 in pre-petition litigation expenses payable to the Fryar Law Firm, P.C., relating to the Fryar Law Firm, P.C.'s representation of LT and others with respect to the claims LT and his affiliates have asserted against the Debtors and others, as well as the claims asserted against LT by the Debtors and others in the suit styled and numbered as follows: *Goldking Onshore Operating, LLC and Goldking Holdings, LLC v. Leonard C. Tallerine, Jr., Goldking Energy Corporation, Goldking Energy Partners I, LP, Goldking Energy Partners II, LLC, Goldking Capital Management, LLC,*

8

*Reta Wellwood DBA Vermillion Contracting Co., Denna Ramsey, and Paul Culotta*, Cause No. 2013-08724 in the 61st Judicial District Court of Harris County, Texas, which is contemporaneously removed and now pending before this Court (the "LT Litigation"); (ii) $5,266.31 alleged by LT to be his reimbursement of payments made by Tracy Santoro ("Santoro"), a former employee, for company expenses incurred by her while LT was still CEO; and (iii) claims originally asserted by LT in the LT Litigation, but which are now represented by that certain First Amended Answer and Counterclaim dated September 26, 2013 ("LT Amended Counterclaim").

### The Claim Filed By GEC

23.     The GEC claim [signed by LT] against GOO seeks payment of $57,728.33 for "charter flight charges" for GOO's alleged use of GEC's Hawker jet.  Cited are 6 flights to and from New Orleans ("NOLA") from Houston in September, two of which are apparently "repositioning" flights for LT's presumed convenience,[5] eight flights in October, eight more flights in November to and from NOLA and Houston, two more of which are for "repositioning", and two flights in December, which are dated after his termination and one of which purports to seek payment for two of Debtors' executives that LT left behind when returning from the meeting with Wayzata where he was terminated as CEO, for cause.

### The Claim Filed By Culotta

24.     Culotta's claim for $16,726.10 is "premised upon" attorneys' fees and costs incurred as a result of GOO's alleged breach of a Separation Agreement confirming his departure from Debtors in December 2011 as its CFO.  The claim consists of fees and expenses billed by his present employer, the Fryar Law Firm, P.C., the counsel representing LT, GEC, and Culotta

---

[5] LT is reported to maintain homes in Houston's River Oaks neighborhood and NOLA's Garden District area.  It was reported he also has a home in the "Hamptons" in New York.

in the LT Litigation.  Culotta was the former Senior Vice President Corporate Planning, Budget and Analysis for GOO, has worked closely with LT, and has assisted LT in his other unrelated business ventures and activities, including those undertaken while each was an officer and fiduciary to the Debtors.  Notably, the claims asserted against Culotta in the LT Litigation, upon which he makes a claim under his Separation Agreement, are not based upon conduct while he was CFO of GOO.  The claims against Culotta stem from his actions <u>after</u> the date of his separation and release in latter 2011, when he served as a consultant to the Debtors.  In 2012, Culotta took active steps to manipulate Debtors' accounting records, masking the previously made wrongful transfers of Debtors' assets for the benefit of LT and his interests to prevent discovery by the Debtors' auditors.

### The Claim Filed By Belanger.

25.    Belanger's claim seeks an alleged "severance payment" in the amount of $270,210.57, of which he claims $12,475 as entitled to priority unsecured treatment, with the balance unsecured.  Belanger's claim also includes "interest" at 6% in the amount of $7,710.57, and "attorney's fees" of $15,000; and attaches affidavits from LT, Belanger, and Santoro.  No written employment letter agreement is attached to the claim, although he alleges that one exists. Any such arrangement required approval from Wayzata and the Debtors' Board of Managers, neither of which were ever sought, much less obtained.  Omitted from the claim entirely is any justification for his refusal to return property of the Debtors, despite Debtors' written demands which has been ignored.  *See*, Exhibit B.

### Objections to the Claims

26.    As explained in detail below, these claims are each subject to disallowance, offset or subordination pursuant to the Bankruptcy Code.

*The LT Claim Should be Disallowed*

27.     The LT claim is subject to disallowance for the reasons set forth in the LT Litigation, and herein.  LT was President and CEO of the Debtors and on Holdings' Board of Managers.  During all relevant times herein, he was a fiduciary of the Debtors.

28.     Despite his fiduciary status, LT treated Debtors, and GOO in particular, as his personal slush fund, stealing and diverting GOO and Holdings' cash for his personal use and for use in his own, separate personal and business activities.[6]

29.     Based upon the results of an independent investigation (and as set out more fully in Debtors' petition in the LT Litigation), it appears that, among other things, LT with the help of other Claimants and/or persons personally loyal and dependent upon LT for their livelihood: (i) embezzled GOO funds directly into LT's own accounts or the accounts of other businesses he owns; (ii) directed GOO to pay LT's personal expenses that were unrelated to GOO's business; (iii) requested significant cash advances for business travel without providing a subsequent true-up of expenses incurred; (iv) submitted falsified invoices from fake vendors and doctored invoices from real vendors in an attempt to "cover up" GOO's payment of his personal expenses; (v) invoiced GOO for employees' work already paid for and performed for another entity LT controlled, which funds LT and his affiliates kept for themselves; (vi) stole GOO checks made out to GOO vendors and deposited them in accounts of his solely-owned entities; (vii) stole GOO checks made out to GOO vendors and deposited them in accounts of his solely-owned entities; and (viii) used GOO employees and assets for his personal business ventures, particularly including one shortly  before he was terminated to fund a "DIP loan" to a fabled New Orleans restaurant in Chapter 11.

---

[6]      Facts to support the characterization are provided in certain accounting investigations conducted by the Debtors and shared with LT before the Bankruptcy Case was filed.  These are articulated further in the LT Litigation.

30.     LT accomplished this systematic misappropriation of corporate assets with the help of his longtime personal assistant, former GOO Vice President and Assistant Treasurer Denna Ramsey ("Ramsey"), and Culotta, each of whom have deep and personal longstanding relationships of trust with, and previous employment by, LT, and each of whom were apparently "moonlighting" for LT and his other businesses while being paid for full time employment by the Debtors.

31.     As will be shown in the course of this proceeding, LT and his corrupt affiliates have engaged in a pattern and practice of misconduct in at least two prior instances.[7]   The misconduct against the Debtors was part of a rehearsed and well established pattern and scheme to steal and defraud those to who he owed fiduciary duties.  They also evidence an understanding of the bankruptcy process as well, which confirm an enhanced level of sophistication in designing transactions that make fiduciary misconduct difficult to discovery and prove.  The Debtors' claims against LT and his affiliates will accordingly seek significant damages arising from the harm suffered for breach of fiduciary duty, fraud, theft, and other claims, and seek disgorgement of all profits or property interests obtained during this period.  The proceeds recovered from this litigation will benefit Wayzata and the Debtors' unsecured creditors under an anticipated plan to help each recoup the tens of millions collectively lost.

---

[7]     For example, when LT served as chief restructuring officer to the East Cameron Partners ("ECP") bankruptcy estate, he arranged for Walker Street Consulting ("Walker Street"), an entity owned and/or controlled by LT and Culotta, to enter into a Management Agreement with EC Offshore Properties, Inc. ("ECOP"), the entity which had purchased the majority of ECP's assets.  Pursuant to the Agreement, Walker Street would manage all operations on certain oil and gas leases on behalf of ECOP for a base fee of $125,000 per month and an additional $2,500 per month for the provision of office facilities.  Walker Street received $127,500 a month from at least May 2010 through January 2011.  Moreover, based on information obtained by Debtors, LT is also alleged to have used ECP estate funds as his own personal revolving line of credit, including using estate funds to pay to remodel his home in New Orleans, and as a way to funnel money to his ex-wife posing as a sham contractor.  At the company that is now Dune Energy, LT similarly engaged in what has been characterized as serial theft, including using company funds to pay for his daughter's BMW lease, coding his acquisition of tailored suits as a "software expense" and generally using that company's capital as a line of credit.  It is clear at this juncture that LT intended to use the Debtors' assets in a similar way from the inception of the investments.  Indeed, even the startup costs submitted by LT for reimbursement by GOO are alleged to be inflated and fraudulent.

32.     LT's diversion of Debtors' funds, personnel, and resources directly harmed Debtors' financial condition by causing shortfalls in GOO's operating cash and negative cash balances in its operating bank account at a critical time in its development and operation.  By his bad choices made while diverting company funds for his personal affairs, he diverted focus from Debtors' core business by critical personnel, including LT himself.  Moreover, LT's elaborate embezzlement scheme—which Debtors have now discovered parallel what he employed in connection with several prior businesses—support presumptions that LT made decisions with respect to drilling, operations and the deployment of capital in such a manner that would allow him to continue to skim and steal money from Debtors under cover of, or in tandem with, seemingly legitimate transactions.  In effect, LT needed financial activity and expenses going out, so that he would use his position of dominance and control to have access to cash flow coupled with the opportunity to "cover up" his misappropriation of company money to fund his personal investments and lifestyle.

33.     Throughout the time LT served as CEO and on its board, Holdings has a Code of Conduct and Ethics dated August 16, 2010.  It was signed by LT and Culotta both.  LT repeatedly violated this Code from the moment it was inked.  Specifically, shortly after GOO had formed but before its payroll procedures were put in place, LT submitted reimbursement requests to GOO on behalf of his entity GEC for alleged payroll costs of its employees for work allegedly performed on GOO-related business (specifically, the acquisition of a set of oil and gas properties known as the "White Oak Acquisition").  In reality, much of the employees' time was spent working for Walker Street Consulting, another of Tallerine's personal ventures, which managed assets sold by East Cameron Partners ("ECP") to EC Offshore Properties, Inc., then a debtor in bankruptcy. But Walker Street Consulting had already paid those employees for their

work via its receipt of $127,500 per month from ECP. GOO paid approximately $200,000 in false salary/wage claims, which were not passed on to the employees, but instead were deposited in GEC's business accounts for LT's personal use,[8] rather than to reimburse these amounts to ECP, the Chapter 11 business LT also owed fiduciary duties to.

34.     The fraud against Debtors intensified in 2011, as Debtors commenced exploration efforts coinciding with an apparent LT personal need for cash to use elsewhere. Over a short period, LT expended GOO's cash and working capital by directing or authorizing its use for non-GOO expenditures including payments that benefited himself, certain of his family members and entities he owns. His personal use of GOO's cash compromised GOO's financial condition, causing a shortfall in GOO's operating cash or a negative cash balance in its operating bank account in June 2011. Other credit was also claimed by LT for "expense" advances. Shortly after the negative impact of his actions were brought to the attention of then CFO Culotta, some cash appears to have been returned by LT to the Company in late June 2011. But the damage was done, and his return of cash was not a full reimbursement of what had been taken, nor was any accounting provided reflecting what he had used the Debtors' money for, nor was Debtors' board informed.

35.     Upon discovery and investigation in late 2012, LT's personal use of Company assets has violated at least the following four provisions of the Code of Conduct and Ethics:

> 2. Loans to Directors, Officers and Employees: The Company is prohibited from, directly or indirectly, making any loan to a Director, officer, or employee of the Company or guaranteeing any loan or obligation on behalf of a Director, officer or employee, except in connection with the relocation of an employee. ...

---

[8]     GEC invoiced GOO for personnel costs in the amount of $200,406 for the period June 12, 2010 through August 31, 2010, which included Culotta (95%), S. Venturatos (100%), R. Holoway (90%), T. Santoro (100%), D. Ramsey (90%), S.R. Tallerine (50%), B. Heath (100%), and J. Wible (95%). GEC invoiced GOO for the period September 1, 2010 through October 15, 2010 in the amount of $190,154 which included the previously listed employees plus LT and D. Chapman.

5.   Corporate Opportunities: ... It is the Company's policy that Directors, officers and employees shall be prohibited from ... using corporate property, information or position for personal gain ...

7.   Fair Dealing:  Each employee should endeavor to deal fairly with the Company's joint interest owners ... No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

8.   Protection and Proper Use of Company Assets:  All employee should protect the Company's assets and ensure their efficient use ... All Company assets should be used for legitimate business purposes.

In addition, it appears  LT likely violated and caused other employees to violate various other corporate policies and procedures, including those related to accounting for cash receipts, vendor invoices, and the cash disbursement process.  These actions also likely violated the Company's Code of Conduct and Ethics provision regarding Fair Dealing, which states in relevant part:

7.   Fair Dealing:  Each employee should endeavor to deal fairly with the Company's ... employees.  No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

Finally, LT and Culotta's failure to immediately report these actions to the Board when first discovered by in Summer 2011 and the resulting violation of the foregoing polices, even -- or especially -- if his intent was innocent, constitutes a violation of the Company's Code of Conduct and Ethics regarding reporting violations of the Code:

3.   The Company Encourages the Reporting of Illegal or Unethical Behavior:  ... In addition, employees should report any violations of law, rules, regulations or tis Code of Conduct and Ethics to appropriate personnel ...

36.   In addition to using Debtors' accounts as his personal piggy bank, upon information and belief, LT also breached the Holdings' LLC Agreement by failing to fully and

candidly disclose his multiple ties to WOE, the entity which sold the initial properties in the White Oak Transaction to Debtors in August 2010. Moreover, it was recently discovered by Debtor that LT also acquired an undisclosed 50% interest in White Oak Energy V Royalty, LLC ("WOE V Royalty") soon after closing the White Oak Transaction for Debtors, without disclosure to or the approval of Holdings' Board of Managers. Because this investment constitutes a "Restricted Opportunity" under the terms of the Holdings LLC Agreement, LT's secret acquisition of the WOE V Royalty interest constitutes a breach of Section 6.10 of the LLC Agreement and comprises another breach of LT's fiduciary duties.

37.     LT's actions, whether by theft or in grossly erroneous choices, have ultimately resulted in the ruination of the Debtors, whereby properties acquired and developed at a cost of over $70 million dollars in capital and debt supplied by Wayzata are now valued at only a pittance of such amount as confirmed after a robust sales process that documents a diminished market value. These breaches of fiduciary duties and theft give rise to affirmative damages against LT, Culotta (to the extent of his activities after his Separation Agreement), and others.

38.     Despite ample opportunity, LT and his confederates have failed to make the Debtors' whole for the harm, losses, and diversion undertaken, as mandated of a fiduciary. None of LT's wrongful conduct and activities were disclosed to Holdings' Board, or Wayzata, its majority member. No accounting has been provided. Indeed, based on GOO's internal records, LT, Ramsey and Culotta attempted at every opportunity to disguise the breadth and amount of GOO's cash that they had diverted. When Holdings' Board and Wayzata discovered and confirmed LT's role in the illegal conduct in December 2012, GOO and Holdings terminated LT and Ramsey.

39.     The impact upon the Debtors of LT's actions while looting the Debtors was not evident until long after the fraud occurred—in part due to the central role LT, Culotta and Ramsey had in making sure the financial irregularities were not discovered by others in the Company or by outside auditors.   But to appreciate how the pattern of irresponsible and fraudulent conduct truly impacted the Debtors over time it is critical to review how the Debtors came into operation, and what occurred in the time before the Chapter 11 Cases were filed.

40.     The Debtors' exploration and drilling efforts in connection with the White Oak Properties which were pushed forward in the first quarter of 2011 failed miserably—indeed they can be best characterized as a disastrous waste of resources.   The Debtors incurred significant exploratory and drilling costs by drilling three (3) wells on the White Oak Properties that did not generate any meaningful return; they were failures.   What they did provide, however, were opportunities for LT to use the multitude of accounting transactions which emanated from this ill-fated drilling program to raid Debtors' coffers for his personal benefit.

41.     LT's use of the Debtors' resources for his own agenda and interests for his separately-owned businesses (which also helped him cure or defer his unrelated personal financial setbacks), constituted a pattern of fiduciary breaches that caused substantial injury to Debtors and materially contributed to their bankruptcy.   LT represented himself as an experienced and skillful oil and gas operator and developer; yet the Debtors' business failed miserably while LT spent his time using the Debtors' resources to fund personal activities and personal business ventures.

42.     The Debtors found themselves operating at a deficit at the very point in time when LT was taking substantial sums from the Debtors.   While the Debtors under LT induced Wayzata to contribute significant amounts of capital to fund these drilling operations and to also undertake

17

another asset purchase from EOG Reserves known as the "Nine Mile Properties." LT used the activity associated with these seemingly legitimate transactions he orchestrated to have transfers and deposits made which lined his own pockets. Some of these transfers comprised outright transfers to himself and controlled affiliates; others involved paying for other personal stakes wholly disconnected from the Debtors; they were disguised as "company" business, but in actuality, were simply for LT's personal pleasure, *e.g.*, using Debtors to pay the buildout of his daughter's blow-dry bar.[9] Still other transactions used bogus invoices to pay a fake vendor owned by his ex-wife. Some even involved stealing checks payable to vendors associated with drilling operations and depositing such checks into his own accounts.

43.     By Fall 2012, the Debtors' business problems manifested in its secured lender, BOA, declaring the Debtors in default. Incredibly, LT pushed through at this time yet another scheme to use stolen money from the Debtors to help fund another personal venture: funding a DIP loan for his Goldking Management entity, to Chapter 11 debtor Felix's oyster bar in New Orleans, prepatory to him to also using still another entity to buy it out of bankruptcy. Fortuitously, the new CFO and accounting staff at the Debtors directly reported to Goldking's board members other than LT that financial irregularities by LT and others appeared to have occurred. This then prompted an investigation.

44.     Separately and also during this time, to forestall foreclosure and associated costs, Wayzata negotiated with BOA, while seeking solutions for the default. Ultimately, Wayzata and later funded the more than $11 million purchase, at par, of the BOA debt. LT was asked to purchase his ratable share of the BOA debt alongside Wayzata, but he refused. He also refused to honor a November 2012 capital call to members that he approved as a member of the Board

---

[9] Such activity followed a pattern deployed elsewhere, such as during his service as ECP's chief restructuring officer via WSC.

(Wayzata honored this capital call). This exacerbated the impact and losses; it also triggered the resulting expenditure of considerable sums for investigative forensic accounting and legal services.

45.     In total, by Summer 2013, the Debtors had more than $70 million in debt and equity financing for the acquisition and unsuccessful development of the White Oak Properties and the Nine Mile Properties and associated costs of operations, the refinancing of the BOA debt, and the required efforts to discover and take action on the fraud. In turn, this caused the Debtors to default on payment of current account creditors, generating still more in losses. It undercut any ability to obtain capital to develop the oil and gas properties. Ultimately, the Debtors had to commence the Chapter 11 Cases in order to obtain much needed liquidity and to preserve and maximize value through the attempted sale of all or substantially all of their assets.

46.     The sale process that resulted, instead of enabling creditors to be paid, merely confirmed the magnitude of the harm. Despite being professionally implemented and managed by a qualified and independent investment banking and asset disposition firm, the sales process failed to generate any meaningful offers commiserate with the proved producing reserves, much less the more than $70 million sunk cost in the properties.

47.     Illustrative of the sophistication LT has in putting forth accounting excuses which foist needless claims on the Debtors are his other claims. Included in the LT claim is a duplicative claim for amounts purportedly advanced by him for the alleged benefit of Santoro, a former employee, for putative expenses incurred in connection with the Debtors' business. This LT claim should be fully disallowed; the Santoro advance is without basis. The Debtors previously paid Santoro on the same exact expenses that LT claims he separately paid to Santoro. As set forth in Exhibit C hereto, the exact expenses claimed by LT comprise amounts that

Santoro was already paid by the Debtors, with Santoro affirming and confirming her receipt by hand delivery on January 18, 2013 of "Goldking Onshore Operating Check #3772, $2,160.00, matches the amount charged on my personal credit card for NAPE registrations." Similarly, the same document reflects Santoro also accepted from the Debtors other reimbursement checks, $283.58 for her health club and cell phone, and $3,106.35 for reimbursement of her credit card for the Christmas luncheon, and which LT claims to now own via assignment. Either LT is making a false claim for amounts known to have been previously paid to Santoro and for which he did not pay to her, or he needlessly paid amounts to Santoro to acquire a claim for reimbursement which already were paid by the Debtors, or that such amounts if received by Santoro from both LT and the Debtors comprise amounts recoverable by LT if improperly retained by her. In any event, this LT claim for $5,226.31 should be fully disallowed. If LT made them with knowledge Santoro was already fully paid, further sanction should issue against him.

48.     Similarly, the claims asserted by LT for "indemnification for attorneys' fees and costs" should be similarly disallowed because (i) the acts and conduct reflected herein comprise the type of conduct precluding advancement, (ii) ) many of the fees and expenses demanded are expressly excluded from the indemnity provisions of the Holdings' LLC Agreement because that were incurred in connection with proceedings initiated by LT himself, (iii) the reasonableness and necessity of the purported fees and costs sought is open to material objection, to the extent not proper nor adequately documented[10], and (iv) the advancement sought is subject to disallowance under section 502 and subordination under section 510 of the Bankruptcy Code.

---

[10] For example, LT seeks approximately $34,000 in "expenses" billed for Culotta's own participation in the defense of the case, which appear as billing entries on the legal invoice attributed to LT and LT Capital Corp. Culotta is a fact witness and a party to the LT Litigation. Nothing in Holdings' LLC Agreement or any provision of Delaware

49.     The claims asserted or implicated under LT's stated "reservation" are similarly subject to disallowance, and do not state nor comprise a cognizable claim as described therein.

50.     These facts, as well as those set forth in Debtors' claims in the LT Litigation support the disallowance or offset of the LT claims in the cases.

*The GEC Claim*

51.     The GEC claim is similarly subject to disallowance.    The terms of LT's employment letter expressly limit reimbursements to the cost of a ticket on a commercial airline. GEC's proof of claim is yet another documented instance of LT failing to abide by his contractual and fiduciary obligations.   The airfare costs GEC seeks to recover were incurred on account of LT's personal business or for personal convenience to LT.   The costs requested in the GEC claim are also not permitted under the terms of the Debtors' letter agreements with LT, which only allow reimbursement of private plane costs to the extent of the price of comparable commercial airfare.

52.     LT was the President & CEO of GOO and had an employment letter that provides for annual salaried compensation of $350,000. Per LT's terms of employment, he was initially to be reimbursed for ordinary and necessary business expenses directly related to his employment, home office internet access, mobile communication charges and Houstonian Lite monthly dues.  LT entered into an Addendum to his employment agreement that provided further definition of reimbursable expenditures and covered typical areas of employee reimbursable expenditures such as: travel and entertainment; club dues; professional licensing fees; and mobile communication fees. The Addendum also provided strict rules regarding charges to GOO for the airplane's use. The addendum stated, in relevant part that:

---

law permits a party to claim indemnification or advancement for the value of their own time spent responding to a suit.

> All reimbursements by the Company provided for in this Agreement are conditioned upon (i) Employee's submission to the Company an expense report that includes reasonably satisfactory documentation and an itemized account for such expenses with [sic] a reasonable period after they are incurred and (ii) prior approval by an individual appointed by the Company's Board of Directors, whose review and approval shall be evidenced by initialing and dating the expense report.

The Addendum was signed and acknowledged as accepted by LT on April 5, 2011.

53.     The purported costs GEC has made against the Debtors should be disallowed. They appear to be for LT's convenience or personal needs.  Imposing excessive air fares on this business, when commercial flights were available between Houston and either New Orleans or Minneapolis, was grossly excessive.  Claims associated with putative "repositioning" flights are not proper under the Addendum.  It also was routine for LT to use his jet for personal needs.[11] As noted, he owns homes in both NOLA and Houston, and perhaps elsewhere.  Accordingly, the repositioning charges by GEC are excessive, not properly allocable to Debtors, and subject to disallowance.

### The Culotta Claims

54.     Culotta's claim for costs associated with Debtors' alleged breach of his Separation Agreement is also invalid.  The claims asserted against Culotta in the LT Litigation are premised solely on acts, transactions and events arising after the date of his Separation Agreement.  Culotta, though previously terminated from his position as Senior VP Corporate

---

[11]     For example, as quoted in a New York Times article on high rolling jetsetters, LT was profiled and pictured, with the article noting: "[LT], the independent oil and gas producer, and his wife, Janet, routinely extend their hospitality to pals on their frequent "short hops" between their houses in Houston, East Hampton and New Orleans.

   "Our attitude is, 'We're going, there's room, so come,' " Mr. Tallerine said.

   On a recent Thursday morning, Diane Sustendal, a writer in New Orleans, got a call from LT, who said he was flying to New York to meet with his investment bankers.  He had space on his eight-seat Hawker 800 XP, a jet that is the aeronautic equivalent of a midsize sedan on the car rental lot.  Did she need a lift? http://www.nytimes.com/2008/07/13/fashion/13hitch.html?pagewanted=all&_r=1&.

Repositioning flights are not reimbursable; they also are subject to dual purposes.

Planning, Budget and Analysis in December 2011, continued in a consultant capacity to the Debtors. In that role, he was paid by Debtors. He acted in this role at the express requirement of LT, who requested Mr. Hebert, the newly designated replacement CFO, to draft a "work plan" for Culotta for LT's review. *See*, e.g. Exhibit E.

55.     In that "consultant" role, Culotta, at LT's direction, assumed continued oversight of the Debtors' audit, working closely with the accounting staff he had overseen as CFO. This, of course, included how and when now questionable 2011 LT transactions that involved taking Debtor money would be viewed by Debtors' auditor, Hein's Associates. Because these were 2011 transactions known to Culotta, while CFO, he would be specially able to ensure they remained undiscovered. Both Hein and Hebert were kept in the dark. LT, on his part, kept Hebert preoccupied with CFO duties incident to other substantial proposed property acquisitions. Culotta in 2012 thus continued to assist LT after his Separation Agreement in covering up LT's wrongful scheme from Wayzata and the other members of the Holdings' Board. In effect, Culatta was left free to make certain that the 2011 audit to be issued in 2012 did not reveal any of these LT transactions to Hebert, Wayzata, or other members of the Board. Hebert, in turn, had no reason to suspect wrong doing by LT or Culotta—both were fiduciaries and executives for the period preceding his arrival.

56.     Culotta's manipulations were highly successful for LT: the auditors remained ignorant; the LT thefts never were flagged; Debtors' received a clean audit. Mr. Hebert, as the new CFO remained uninformed of the LT transfer. And until later 2012, when Hebert, the other board members and Wyzata became aware of what LT had been doing, the fraud remained hidden.

57.     Culotta's manipulations continued through September 2012, when his role as a "consultant" was suggested to be extended by LT to enable Culotta its help on yet another looming audit.   This was one prompted by another irregularity associated with yet another fiduciary breach: a wire transfer LT directed be made to a law firm that did work for the Debtors. This transaction involved another LT personal use of Debtors' money, which was used by LT through preplanned use of a law firm trust account to fund a "DIP" loan LT provided via Goldking Management, LLC to enable him to soon thereafter purchase, through yet another entity, Felix's Oyster Bar restaurant in its Chapter 11 case. See, e.g. Docket in *In re Felix,* 12-12137 (Bankr., E.D. La., J. Magner presiding).   Therefore, Debtors' assertion of these claims against Culotta do not implicate, or constitute a breach, of the Separation Agreement.   Culotta's claim should be disallowed in full.

*The Belanger Claim*

58.     Belanger asserts an unsecured claim for amounts alleged to be due under a purported one year employment agreement.   The Debtors dispute that Belanger had any employment agreement providing for severance payments as alleged.   No such agreement exists in Debtors' books and records.   Indeed, any such agreement required the approval of Wayzata pursuant to 6.6 (vi), (xvi), (xvii) and (xxi) of the operative Amended LLC Agreement for Holdings.   No one else has such an agreement for one year – even LT as CEO.   Moreover, Belanger's dubious assertion that an oral promise from LT establishes the employment agreement at the center of his claim is belied by the absence of any such claims by others, most notably Culotta, who specifically had only a written and terminable at will employment arrangement.   It is also contradicted by the plain language of his signed employment letter agreement. See Exhibit D.   Further, LT had no authority [despite what he swears otherwise in an

attached "affidavit" to Belanger's POC], without Board review and authorization, to orally agree to any severance arrangement with Belanger of this type, and LT's efforts to support such a claim contradict his duties to the Debtors at the time the agreement was purportedly established. *See*, LLC Agreement, at 6.6. Indeed, that Belanger lacks any severance as claimed is made expressly clear by paragraph 2 of the employment letter.[12] In the alternative, even if Belanger had any such employment agreement, he would also have a duty to mitigate, and any compensation earned after his termination should be credited against any amounts asserted to be owed, if any, by the Debtors. As a result, information concerning his taxable income for the period covered will be required. Lastly, Belanger has continued, despite demands made by the Debtors, to retain and withhold return of Debtors' property, including computer hardware, data and information. This conduct violates the stay, and represents contempt of the Court. Accordingly, disallowance of any claim by Belanger is appropriate.

*Objection Under Section 502*

59.     As to the claims made by Belanger and LT for "service related" activities, each should have their claims disallowed to the extent that any portion of the claim is premised upon services for which such claim exceeds the reasonable value of the services so claimed, because each of the them are considered to be "insiders," as provided in section 502(b)(4).

60.     As to Belanger's purported employment agreement claim (which is fully disputed), such claim should be disallowed to the extent it exceeds the amount represented by one year's compensation, thereby excluding any putative claim for interest or attorneys' fees, as provided under section 502(b)(7).

---

[12] Notably, this agreement only provided for something different "if" an incentive plan were implemented; there was no incentive compensation plan ever approved, nor during the period covered by Belanger's employment, any sale of all or substantially all assets.

61.     Belanger's purported employment agreement claim (which is fully disputed) should also be reduced to the extent it includes amounts properly to be credited on account of any employment tax applicable, as provided under section 502(b)(8).

62.     As to each of the Claimants, the claims asserted should further be disallowed to the extent Debtors are entitled to recovery from such Claimant on account of sections 542, 543, 550, or 553 of the Bankruptcy Code, or such Claimant is a transferee of a transfer which is avoidable as provided in section 502(d), all as set forth above as to each Claimant.  Each of the Claimants is subject to claims for relief under chapter 5 of the Bankruptcy Code and each is thereby subject to disallowance.

63.     As to LT and Culotta, any claim is further subject to disallowance as to any right or claim premised upon reimbursement or contribution which remains contingent as of the time of such claim for reimbursement or contribution, pursuant to section 502(e).

64.     As to all Claimants, each claim should be disallowed, subordinated or offset on account of the affirmative claims asserted herein and in the LT Litigation.

## RELIEF REQUESTED

65.     The Debtors respectfully request the entry of an order (i) disallowing the claims; and (ii) granting related relief.

## COUNTERCLAIMS FOR RELIEF

66.     This is an adversary proceeding commenced by Debtors, pursuant to sections 105, 362, 542, 544, and 548 of the Bankruptcy Code, Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking relief against each of the counterclaim defendants as follows:

a.      As against each of the Defendants named herein who are also Claimants as identified above, subordination is sought for any remaining allowed claim against the Debtors pursuant to section 510 of the Bankruptcy Code.

b.      As to Defendants LT and Belanger, recovery in damages, disgorgement, and/or return of property taken is sought for any transfer made which is avoidable under sections 544, 548 and 550 of the Bankruptcy Code.

c.      As against Defendant Belanger, recovery is sought for (i) turnover relief under section 542(a) Bankruptcy Code to require Belanger to return certain office equipment and computer hardware/software comprising property of the estate (the "Property"), purchased and owned by GOO and in Belanger's possession and (ii) a judgment from this Court declaring Belanger in civil contempt pursuant to section 105 of the Bankruptcy Code for continuing, deliberate and wanton violation of sections 362 and 542(a) of the Bankruptcy Code.

**Jurisdiction and Venue**

67.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(E).

68.     On November 20, 2013, the United States Bankruptcy Court for the District of Delaware entered its Order transferring venue of the Chapter 11 Cases to the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409, and the Venue Transfer Order.

69.     This adversary proceeding is initiated under Bankruptcy Rule 7001(1) and the statutory predicates for the relief requested herein are found in sections 105 and 542 of the Bankruptcy Code.

**Plaintiffs**

70.    On the Petition Date, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

71.    Background facts related to the Debtors are contained in the Declaration of Edward Hebert In Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 2], and in the foregoing allegations set forth above, which are incorporated herein by reference.

**Defendants**

72.    Defendant LT is an individual who was formerly President and CEO of the Debtors, and who has a minority interest in the Debtors.  Pursuant to his proof of claim he may be served with process at the following address:  Leonard C. Tallerine, Jr., c/o Benjamin W. Kadden, Lugenbuhl, Wheaton, Peck, et al., 901 Poydras St., Suite 2775, New Orleans, LA 70130.

73.    Defendant GEC is, upon information and belief, a Texas corporation wholly owned and controlled by LT.  GEC can be served with process at its agent for service: Leonard C. Tallerine, Jr., c/o Benjamin W. Kadden, Lugenbuhl, Wheaton, Peck, et al., 901 Poydras St., Suite 2775, New Orleans, LA 70130.

74.    Defendant Culotta is a former senior executive of the Debtors.  Pursuant to his proof of claim he may be served with process at the following address:  15203 Rose Cottage Drive, Houston, TX 77069.

75.    Defendant Belanger is an individual residing in Metairie, Louisiana.  Belanger is a former officer of the Debtors.  Belanger may be served at 1800 Butternut Avenue, Metairie,

Louisiana 70001.  Pursuant to his proof of claim he may also be served with process at the following address:  Whitney Louis Belanger, Jr., c/o The Sheller Law Firm, P.L.L.C., 810 Waugh Drive, 2nd Floor, Houston, TX 77019.

76.     Each of the named parties has filed a proof of claim in this Court, as described above.

## Factual Background

77.     The Debtors reallege and incorporate the forgoing allegations of fact and law.

## The Claims Are Subject to Subordination

78.     Each of the Claimants assert claims which are subject to vigorous dispute and, as set forth above, involve actions and conduct which entails that the claims for each should be subject to subordination, if not fully disallowed.

79.     The Fifth Circuit in *In re Mobile Steel Co.* articulated the three-prong test for equitable subordination: (1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

80.     As set forth above, each of the Claimants have engaged in inequitable conduct. Moreover, the misconduct resulted in injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant.  Lastly, there is nothing inconsistent with the other provisions of the Bankruptcy Code to render subordination improper.

81.     The other creditors should not have their rights and recoveries diluted as a result of any claims associated with the Claimants based upon the conduct attributable to each of them,

described above.  In each instance, to whatever extent the claims are not fully disallowed on other grounds, subordination is proper.

## Belanger's Persistent Contempt of the Stay

82.     Until May 15, 2013, Belanger was employed by the Debtors as their Senior Vice President for Reservoir Engineering.  Beginning in late 2010 and continuing through early 2012, GOO purchased the Property that Belanger continues to retain and refuse return as listed in further detail on Exhibit A.  Throughout this period until the end of his employment on May 15, 2013, GOO allowed Belanger to use and possess the Property in his work duties for the Debtors.

83.     Belanger's employment with the Debtors terminated on May 15, 2013 (the "Termination Date").  After the Termination Date, GOO made numerous attempts to arrange for the return of the Property.  Belanger ignored and/or failed to respond to these attempts. Moreover, on January 28, 2014, counsel to GOO sent a letter (the "Demand Letter") attached hereto as Exhibit B, by first class mail (receipt presumed), via certified mail, return receipt requested (but refused by Belanger) to Belanger and Belanger's counsel of record in the LT Litigation, notifying Belanger of GOO's chapter 11 bankruptcy case and the existence of the stay.  By the demand and otherwise by operation of law, Belanger's obligation to return the Property under section 542(a) of the Bankruptcy Code, had matured.  His ongoing refusal to immediately return the Property to GOO is in contempt of the Court.

## Count I

## Subordination of the Claims

84.     The Debtors restate the allegations set forth above.

85.     LT's acts and conduct in self dealing while a fiduciary as described and to be further proven plainly support his inequitable conduct. The misconduct has given rise to sizable claims; Debtors' business unquestionably harmed.

86.     GEC's conduct, and its nexus to LT's personal use and acts, similarly is inequitable and subject to subordination.

87.     Culotta's acts in helping LT avoid detection of his self dealing use of Debtors' assets is similarly inequitable conduct. Instead of reporting the thefts and transfers, he hid them. Then, after his separation as CFO, he came back into Debtors as a consultant at LT's behest to help cover up the fiduciary mismanagement.

88.     Belanger has similarly hurt the Debtor by his refusal to return property, and to flaunt the stay.

89.     Section 510(c) of the Bankruptcy Code provides the following:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). Allowing any portion of these claims to dilute recoveries to other creditors would be inconsistent with the Bankruptcy Code.

90.     Pursuant to section 510(c), any remaining allowed amount on account of any of the Claimants' claims should be subordinated, if not wholly disallowed.

**Count II**

**Fraudulent Transfer – Section 548**

91.     The Debtors restate the allegations set forth above.

92.     The transfers made to or for the benefit of LT and his other wholly owned businesses were undertaken in fraud of the Debtors.

93.     Section 548(a)(1) of the Bankruptcy Code states:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)
> > (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > (ii)
> > > (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> > >
> > > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> > >
> > > (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> > >
> > > (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

94.     The transfers to LT, personally and to or for his personal and business enterprises, were without consideration to, and in actual fraud of, the Debtors.

95.     The Debtors are entitled to judgment against LT for the transfers made from the Debtors.

96.     Section 550 of the Code imposes liability upon LT or any initial transferee as known or yet to be identified, as well as upon and "any immediate or mediate transferee of such initial transferee." 11 U.S.C. 550(a). The Bankruptcy Code states:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from - (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). The Debtors therefore seek recovery against LT for any transfers made in actual fraud of the Debtors, and shall further seek to add and recovery judgment jointly and severally as against any other entity complicit and which has obtained the benefit of a fraudulent transfer in actual fraud of the Debtors.

## Count III

### Fraudulent Transfer – Section 544

97.     The Debtors restate the allegations set forth above.

98.     In the further alternative, the Debtors contend that LT's looting of the Company, for his own benefit and the benefit of his wholly owned businesses or to benefit and transfer amounts to others, comprise fraudulent transfers under other applicable law. *See* 11 U.S.C. § 544(b)(1) (providing that a trustee may avoid any obligation or transfer "that is voidable under

applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title").

99.    At the time that the monies were taken by or for the benefit of LT and others he controlled or was personally invested in, the Debtors had one or more creditors of the Debtors (including, without limitation, landlords, taxing authorities and trade creditors) whose claim(s) arose (at the time of the transaction giving rise to the challenged transfers) and who have claims against the Debtors' estates as of the date the Chapter 11 Cases were filed.

100.    Bankruptcy Code section 544(b) gives the Debtors, as the estate representative, the power of an unsecured creditor with an allowable claim under applicable state or federal law.

101.    The transfer made and set forth above and in the LT Litigation comprise claims in actual fraud of the Debtors, and for which recovery is hereby sought.

102.    The transfer made by the Debtors to LT and others who aided and abetted in the transfers which comprise thefts or takings from the Debtors' at a time when they were each fiduciaries include payment of salary and benefits for which disgorgement is proper and requested.

103.    Section 550 of the Code imposes liability upon LT or any initial transferee as known or yet to be identified, as well as upon and "any immediate or mediate transferee of such initial transferee." 11 U.S.C. 550(a). The Bankruptcy Code states:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from - (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).  The Debtors therefore seek recovery against LT for any transfers made in actual fraud of the Debtors, and shall further seek to add and recovery judgment jointly and severally as against any other entity complicit and which has obtained the benefit of a fraudulent transfer in actual fraud of the Debtors.

**Count IV**

**Turnover Relief pursuant to Section 542(a) of the Bankruptcy Code**

104.   The Debtors restate the allegations set forth above.

105.   The Debtors are entitled to turnover of the Property from Belanger.  Belanger should immediately remit the Property in his possession to GOO.  The Property is subject to turnover pursuant to section 542(a) of the Bankruptcy Code, which provides:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian in possession, custody or control, during the case, of property that the trustee may use, sell or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

106.   The Property consists of office equipment and computer hardware/software that GOO would otherwise be able to use, sell or lease pursuant to section 363 of the Bankruptcy Code.  Furthermore, GOO believes the Property still has significant value, and could be of benefit in the operation of its business.

107.   Belanger has refused demands for return of the Property.  The Property comprises property of the Debtors' bankruptcy estates.  By refusing to return the Property, Belanger is in clear violation of the automatic stay and section 542(a) of the Bankruptcy Code.

108.   Based on the foregoing, Belanger should be directed to turn over possession of the Property to GOO immediately.

35

## Count V

### Civil Contempt Pursuant to 11 U.S.C. § 105(a)

109.    The Debtors restate the allegations set forth above.

110.    Bankruptcy courts have statutory authority to conduct civil contempt proceedings and enter civil contempt sanctions pursuant to section 105 of the Bankruptcy Code. *See* 11 U.S.C. § 105(a); *see also Placid Refining Co. v. Terrebone Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.*), 108 F.3d 609, 613 (5th Cir. 1997) ("[W]e assent with the majority of the circuits ... that a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105.").

111.    Pursuant to section 542(a) of the Bankruptcy Code, Belanger is obligated to return the Property to GOO. *See* 11 U.S.C. § 542(a).

112.    By virtue of previous demands made and notice provided regarding proceedings in the Chapter 11 Cases, including those that prompted him to file a proof of claim in the case, Belanger has actual knowledge of GOO's bankruptcy case and his obligation, under section 542(a) of the Bankruptcy Code, to return the Property to GOO immediately.  Belanger also has notice of section 362 and the stay in effect prohibiting the retention of property of the estate. The Defendant nevertheless refuses to return the Property to GOO.

113.    As a result, Belanger is in civil contempt for his continuing, deliberate and wanton violation of the automatic stay and section 542(a) of the Bankruptcy Code, and GOO is entitled to money damages as a result of his civil contempt.

### Count VI

### Costs And Attorneys' Fees

114.    The Debtors restate the allegations set forth above.

36

115.    The Debtors request that the Court award all reasonable costs and attorneys' fees in connection with bringing this action unless turnover of the Property is agreed to immediately.

## CONCLUSION

WHEREFORE, the Debtors request judgment as described and sought herein and grant such other and further relief as is just and proper.

Dated: April 28, 2014                    Respectfully submitted,

**HAYNES AND BOONE, LLP**

*/s/ Patrick L. Hughes* _____
Patrick L. Hughes
Texas Bar No. 10227300
Charles A. Beckham, Jr.
Texas Bar No. 02016600
Ian T. Peck
Texas Bar No.  24013306
Christopher L. Castillo
Texas Bar No. 24065022
Haynes and Boone, LLP
1221 McKinney Street, Suite 2100
Houston, Texas  77010
Telephone:  (713) 547-2000
Facsimile:  (713) 547-2600

**COUNSEL FOR THE DEBTORS**

**GIBBS & BRUNS, LLP**

*/s/ Barrett H. Reasoner*
Barrett H. Reasoner
breasoner@gibbsbruns.com
Texas Bar No. 16641980
Mark A. Giugliano
mgiugliano@gibbsbruns.com
Texas Bar No. 24012702
Laura J. Kissel
lkissel@gibbsbruns.com
Texas Bar No.  24046223
Gibbs & Bruns, LLP
1100 Louisiana, Suite 5300
Houston, Texas  77002
Telephone:  (713) 650-8805
Facsimile:  (713) 750-0903

**SPECIAL LITIGATION COUNSEL FOR THE DEBTORS**

## **LIST OF EXHIBITS**

Exhibit A:    Debtors Property Retained by Belanger

Exhibit B:    Demand Letter to Belanger

Exhibit C:    Santoro Email Confirming She Was Paid

Exhibit D:    Belanger signed Employment Letter

Exhibit E:    Culotta Work Plan Memo